IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NICHOLAS J. KEHLER, DIRECTLY AGAINST AND DERIVATELY ON BEHALF OF ALBERT ANDERSON, INC. D/B/A CONNECTED ENTERTAINMENT, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | Civil Action No. 16-5318 (JBS/KMW) |
| v. | **OPINION** |
| ALBERT ANDERSON, INC. d/b/a CONNECTED ENTERTAINMENT and ALBERT ANDERSON, | |
| Defendants. | |

APPEARANCES:

Christopher Joseph Macchi, Esq.
MACCHI LAW GROUP LLC
309 N. Fellowship Road, Suite 200
Mt. Laurel, NJ 08054
    Attorney for Plaintiff

Georgios Farmakis, Esq.
WEIR & PARTNERS LLP
215 Fries Mill Road, Second Floor
Turnersville, NJ 08012
    Attorney for Defendants

**SIMANDLE, Chief Judge:**

## I.    INTRODUCTION

    Plaintiff Nicholas J. Kehler (hereinafter, "Plaintiff")

brings this action arising out of a turbulent former employment

relationship between Plaintiff and Defendant Albert Anderson,

Inc., d/b/a Connected Entertainment and Defendant Albert Anderson (hereinafter, "Mr. Anderson"), the principal majority owner of Connected Entertainment (collectively, "Defendants"). Plaintiff asks the Court for a declaratory judgment that he is the 49% minority equity owner of Connected Entertainment, while also bringing direct and derivative claims against Defendants relating to compensation arising Plaintiff's termination from the company. Defendants move to dismiss Plaintiff's Complaint under Rule 12(b)(1), Fed. R. Civ. P. for lack of subject matter jurisdiction and under Rule 12(b)(6), for failure to state a claim. For the following reasons, the Court grants in part and denies in part Defendants' motion.

## II. BACKGROUND[1]

### A. Factual Background

On October 3, 2012, Mr. Anderson hired Plaintiff as a Sales Associate with Connected Entertainment, a photo booth rental company. (Compl. at ¶ 10.) Plaintiff was initially paid $10.00 per hour as a "Sales Associate." (Id.) On January 1, 2013, Plaintiff and Mr. Anderson allegedly entered into an oral

---

[1] For purposes of the pending motions, the Court accepts as true the version of events set forth in Plaintiff's Complaint, documents explicitly relied upon in the Complaint, and matters of public record. See Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014).

contract agreement regarding their business relationship, the terms of which were as follows:

> Mr. Anderson maintains 51% majority equity ownership in Connected Entertainment, as Mr. Anderson started the company by investing personal funds to commence business. Plaintiff maintains 49% minority equity ownership in Connected Entertainment through sweat equity. Mr. Anderson was given the title "Owner/Chief Executive Officer" of Connected Entertainment, and Plaintiff was given the title "Owner/Director of Operations" of Connected Entertainment.

(Id. at ¶ 12.)[2] After this point, Plaintiff began working under the assumption that he would be an equity owner of the company, eventually receiving 49% of the company in return for his sweat equity. (Id. at ¶ 13.) Plaintiff did not receive an hourly wage after agreeing to the terms of the oral contract with Mr. Anderson. (Id.) Instead, he received biweekly stipends ranging from $100 in January 2013 to $300 in February 2016. (Id. at ¶¶ 15-17.) These were the same amounts of money that Mr. Anderson paid himself. (Id. at ¶ 71.)

In various client interactions after January 2013, Plaintiff referred to himself as an "Owner/Director of Operations" of Connected Entertainment, and Mr. Anderson never objected to any of these characterizations. This included Plaintiff changing his company email signature to reflect his

---

[2] Plaintiff alleges that the terms of this oral agreement are evidenced in thousands of email messages between him, Mr. Anderson and the company accountant through the course of Plaintiff's employment.

new title (Id. at ¶ 18), changing his business cards (Id. at ¶ 19), and referring to Mr. Anderson as his "business partner." (Id. at ¶¶ 20, 22, 24-25, 29.)  Mr. Anderson also referred to Plaintiff as his "business partner" as well. (Id. at ¶ 33.)

However, Plaintiff and Mr. Anderson eventually began to clash regarding the direction of the company.  On April 23, 2015, Mr. Anderson emailed Plaintiff, "[i]t seems we have been drifting apart over the last few months on how to run this and the direction we are going." (Id. at ¶ 27.)  Then, on September 10, 2015, in an email to the company accountant, Mr. Anderson wrote, "[Plaintiff] is very interested in total control of the company.  Long story short you can see his arrogance of how he feels he built the company and thinks he can force me out . . . He think he deserves the entire thing based on his work, which is clearly not going to happen. I'd like to devise a way he can buy me out of my 51% ownership while I also can receive certain levels of income." (Id. at ¶ 30.)  Two days later, in another email to the company accountant, Mr. Anderson wrote, "[w]hile [Plaintiff has] built the company to a position that is generating money, it's frankly not worth it anymore to work with him.  You got a small taste of what it's like to work with him . . . The best option is to take a buyout, maybe $25,000, on this investment and get some kind of percentage of the annual revenue generated . . . I'll step away and turn entire control and my

51% ownership over to him with all the risk now being on him."
(Id. at ¶ 31.) In June and October 2015, Mr. Anderson made K-1
Distributions to himself in the amounts of $3,500 and $4,200,
but did not provide any K-1 Distribution to Plaintiff. (Id. at
¶¶ 28, 32.)

Buyout negotiations between Mr. Anderson and Plaintiff
commenced in January 2016, with Mr. Anderson stating that "[y]ou
were advised your investment was through sweat equity. For your
work, I offered 49%. This was offered to you several times last
year and would come in to play this year when we divided the
profits. You also make more than I do in a paycheck. You agreed
to these terms when we talked and now wish to change them." (Id.
at ¶ 40.) Plaintiff countered that "[t]he reason we have so
much money coming in is because of what I built. But I am the
one who puts every free minute I have into the business. That's
my main issue. Doing all the work and making less than half."
(Id. at ¶ 39.)

Mr. Anderson scheduled a meeting for February 11, 2016 to
further discuss the possibility of a buyout. (Id. at ¶ 43.)
After Plaintiff missed a meeting on February 16, the next day,
Mr. Anderson terminated Plaintiff via text message as
Owner/Director of Operations of Connected Entertainment. (Id. at
¶ 45.) Mr. Anderson explained that "[b]ecause you missed last
nights (sic) meeting I am informing you now that you are no

longer employed with connected entertainment or Albert Anderson inc.  I have paperwork to provide you with regarding this separation which will explain everything in detail." (<u>Id.</u> at ¶ 46.)

On March 1, 2016, Plaintiff requested copies of financial documentation from the company accountant to assess the value of Connected Entertainment, but she denied his request and informed him that he was not an equity owner and that he had no right to inspect the company's financial documents. (<u>Id.</u> at ¶ 48.)  The accountant further asserted that Plaintiff was a "W-2 employee" of Connected Entertainment, and Defendants confirmed this in a letter to Plaintiff on the same day. (<u>Id.</u> at ¶ 48-49.) According to Plaintiff, Mr. Anderson essentially stopped buyout negotiations with Plaintiff, terminated and locked him out, and then failed to pay him the fair value of his 49% equity interest in the company, or a fair wage under federal and state law. (<u>Id.</u> at § 103.)

## B. Procedural History

Plaintiff filed a seventeen-count Complaint against Defendants, asserting direct state law claims of fraud, breach of oral contract, breach of implied-in-fact contract, quantum meruit restitution/unjust enrichment, promissory estoppel, constructive fraud, negligent misrepresentation, tortious interference with business relations, and violations of N.J.S.A.

§ 34:11-4.3 (termination or suspension of employment), N.J.S.A.
§ 34:11-4.4 (withholding or diverting wages); N.J.S.A. § 34:11-
4.8 (dispute over amount of wages); N.J.S.A. § 34:11-56a4;
(minimum rate), and N.J.S.A. § 34:11-24.2 (penalty for
violation). [Docket Item 1.] Plaintiff asserts derivative
breach of fiduciary duty claims (duty of care, duty of loyalty,
and duty of good faith and fair dealing), as well as waste of
corporate assets. [Id.] Finally, Plaintiff asserts one federal
law claim – a violation of 29 U.S.C. § 206, for failing to pay
him minimum wage. [Id.] Plaintiff requests (1) a declaratory
judgment stating that Plaintiff is the 49% minority equity owner
of Connected Entertainment, (2) compensatory damages based on
backpay owned to him or the value of the business at the time of
his termination, (3) punitive damages, (4) rescission of the
employment contract between Plaintiff and Mr. Anderson, (5)
piercing of the corporate veil of Albert Anderson, Inc. d/b/a
Connected Entertainment, (6) attachment of Mr. Anderson's wages
and pension as a police officer to satisfy any judgment rendered
against Defendant, and (7) attorney's fees. (Compl. Prayer for
Relief).

Defendants filed a motion to dismiss Plaintiff's Complaint
for lack of subject matter jurisdiction under Rule 12(b)(1),
Fed. R. Civ. P., and for failure to state a claim pursuant to

Rule 12(b)(6), Fed. R. Civ. P. [Docket Item 4.] Plaintiff filed a timely opposition. [Docket Item 5.]

## III. STANDARD OF REVIEW

### A. 12(b)(1)

A motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) which is filed prior to answering the complaint is considered a "facial challenge" to the court's subject matter jurisdiction. Cardio-Med. Assocs. v. Crozer-Chester Med. Ctr., 721 F.2d 68, 75 (3d Cir. 1983). This is distinct from a factual attack on the court's subject matter jurisdiction which can only occur after the answer has been served. Mortensen v. First Federal Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). In deciding a Rule 12(b)(1) motion to dismiss which is filed prior to an answer, the court must "review only whether the allegations on the face of the complaint, taken as true, allege facts sufficient to invoke the jurisdiction of the district court." Licata v. U.S. Postal Serv., 33 F.3d 259, 260 (3d Cir. 1994). When a defendant files a motion under Rule 12(b)(1), the plaintiff bears the burden of establishing subject matter jurisdiction for the sake of remaining in federal court. Gould Elec., Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000).

**B. 12(b)(6)**

Pursuant to Rule 8(a)(2), Fed. R. Civ. P., a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not required, and "the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citations omitted).  While a complaint is not required to contain detailed factual allegations, the plaintiff must provide the "grounds" of his "entitle[ment] to relief", which requires more than mere labels and conclusions. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

A motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court concludes that the plaintiff failed to set forth fair notice of what the claim is and the grounds upon which it rests. Id.  A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).  Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading

that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Id. at 678.

## IV. DISCUSSION

### A. The Court Has Subject-Matter Jurisdiction

Defendants argue for dismissal of Plaintiff's Complaint under 12(b)(1), Fed. R. Civ. P. because the "crux" of the Complaint is that Plaintiff "was not a W-2 employee, but a 49% owner of Connected Entertainment." (Def Br. at 8.) To summarize their argument: the Court derives jurisdiction from only Plaintiff's federal Fair Labor Standards Act ("FLSA") claim (Count XI), which the court must dismiss because the gravamen of Plaintiff's Complaint is that he is a 49% equity owner in Connected Entertainment, not an employee. Defendants accordingly argue that once the FLSA claim is dismissed, the court will be stripped of subject-matter jurisdiction and should dismiss the case. Plaintiff responds that he seeks to recover damages as either an equity owner or an employee of Connected Entertainment, and that failure to bring a cause of action under 29 U.S.C. § 206 would "have been grounds for attorney malpractice." (Opp'n at 6.) Plaintiff asserts that because he properly brings a claim under the FLSA, the Court has federal question jurisdiction over his federal claim and has supplemental jurisdiction over his state law claims.

The parties here are not diverse. Therefore, if federal jurisdiction exists, it must rest upon the existence of a federal question. 28 U.S.C. § 1331 vests in federal district courts "original jurisdiction" over "all civil actions arising under the Constitution, laws, or treaties of the United States." A case "aris[es] under" federal law within the meaning of § 1331 if "a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Empire Healthchoice Assurance, Inc. v. McVeigh, 547 U.S. 677 (2006)(citing Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 27-28 (1983)).

Defendant incorrectly casts this issue as one of jurisdiction. "A district court has federal question jurisdiction in any case where a plaintiff with standing makes a non-frivolous allegation that he or she is entitled to relief because the defendant's conduct violated a federal statute." Growth Horizons, Inc. v. Delaware Cty., 983 F.2d 1277, 1281 (3d Cir. 1993). Defendants' arguments here go to the merits of Plaintiff's FLSA claim, discussed infra, and they have not shown that the FLSA claim is frivolous or immaterial, as they do not dispute that Plaintiff only made $1.76 per hour during his time at Connected Entertainment, well below the $7.25 per hour

federal minimum wage. Moreover, legal insufficiency of a
federal claim does not deprive the federal court of
jurisdiction, as "dismissal for lack of jurisdiction is not
appropriate merely because the legal theory alleged is probably
false, but only because the right claimed is 'so insubstantial,
implausible, foreclosed by prior decisions of this Court, or
otherwise completely devoid of merit as not to involve a federal
controversy.'" Kulick v. Pocono Downs Racing Ass'n, 816 F.2d
895, 899 (3d Cir. 1987) (quoting Oneida Indian Nation v. Cty. of
Oneida, 414 U.S. 661, 666 (1974)). Because Defendants have not
shown that the FLSA claim is frivolous, the court denies the
motion to dismiss under 12(b)(1).

**B. Fair Labor Standards Act Claim**

Defendants also move to dismiss Plaintiff's Complaint under
Rule 12(b)(6) for failure to state a claim. The sole federal
claim in Plaintiff's Complaint is Count XI – a violation of 29
U.S.C. § 206, for failure to pay minimum wage under the Fair
Labor Standards Act ("FLSA"). The FLSA "establishes federal
minimum-wage, maximum hour, and overtime guarantees that cannot
be modified by contract." Genesis Healthcare Corp. v. Symczyk,
133 S. Ct. 1523, 1527 (2013). Under the FLSA, employers are
required "to pay their employees at least a specified minimum
hourly wage for work performed, 29 U.S.C. § 206 (emphasis
added). The FLSA requires employers to pay certain employees

who engage in commerce or are "employed in an enterprise engaged in commerce or in the production of goods for commerce" a minimum wage ($7.25 an hour at all times relevant to this litigation). 29 U.S.C. § 206(a). Employees covered by the FLSA may sue employers who fail to provide that minimum wage, recovering "the amount of their unpaid minimum wages" along with liquidated damages, costs and fees as the circumstances dictate. Id. § 216(b).

"To state a claim under the FLSA for minimum wage and overtime compensation, plaintiffs must allege that: (1) they are employees of the defendant; (2) that their work [or their business's work] involved some kind of interstate activity [;] and (3) the approximate number of hours worked for which they did not receive these wages." Barrios v. Suburban Disposal, Inc., No. 12-2663, 2013 WL 1504489 (D.N.J. Apr. 10, 2013); see also 29 U.S.C. §§ 206, 207.

## 1. Employee-Employer Relationship

The "first inquiry in most FLSA cases is whether the plaintiff has alleged an actionable employer-employee relationship." Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 148 (3d Cir. 2014). The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and an employee as "any individual employed by an employer." Id. §

13

203(e)(1).  Under the FLSA, to employ means "to suffer or permit to work." <u>Id</u>. § 203(g).  The FLSA defines the employer-employee relationship broadly, "'cover[ing] some parties who might not qualify as such under a strict application of traditional agency law principles,' in order to effectuate the remedial purposes of the act." <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 326, (1992).  But the term "does have its limits." <u>Tony & Sysan Alamo Found. V. Sec'y of Labor</u>, 471 U.S. 290, 295 (1985).

In the Third Circuit, courts look to the economic realities of the relationship between the alleged employer and employee. <u>Donovan v. DialAmerica Mktg., Inc.</u>, 757 F.2d 1376, 1382-83 (3d Cir. 1985).  In ascertaining the "economic realities" of the relationship, the following factors should be considered:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; [and] 6) whether the service rendered is an integral part of the alleged employer's business.

<u>Id.</u>  Courts applying the <u>Donovan</u> factors are instructed that "[n]either the presence nor absence of any particular factor is dispositive," and to consider whether, "as a matter of economic reality, the individuals are dependent upon the business to which they render service." <u>Id.</u> at 1382.

14

Here, Plaintiff states that "as asserted by Defendants," he is a "W-2 employee," and attaches a series of exhibits where Defendants state that Plaintiff wa s an employee. (Compl. at § 128; Exs. B, D, F and G to Compl.) But the Court must conduct an independent analysis of whether Plaintiff is an employee under the FLSA, and cannot merely rely on Defendants' characterization of Plaintiff's role after he was terminated.

The Court finds that Plaintiff has sufficiently pled that he is an employee under the FLSA in this instance.  Courts have struggled with characterizing putative owners and partners that also perform work for their companies, like Plaintiff here, as the economic realities test is generally used to distinguish between employees and independent contractors, not employees and owners.  In Steelman v. Hirsch, 473 F.3d 124 (4th Cir. 2007), for instance, the parties were domestic partners who worked together at a dog grooming business founded by the defendant as a sole proprietorship.  When their relationship collapsed, the plaintiff brought an action against the defendant seeking an ownership interest in the company and compensation for work she alleged was performed in reliance on Hirsch's promises, in addition to or in lieu of damages under the FLSA.  The Court found that Plaintiff was not an employee under the FLSA because "a partnership was not consistent with an employer-employee

relationship," as characteristics pertinent to partnerships, such as the ability to share in profits, exposure to risk, and managerial control, "introduce complexities and economic realities which are not consonant with employee status." Id. at 129; see also Wheeler v. Hurdman, 825 F.2d 257 (10th Cir. 1987)(holding that a partner at an accounting firm was not an "employee" under the FLSA because characteristics of partnerships like profit sharing, contributions to capital, part ownership of partnership assets, and right to share in management "are economic realities, and no definition of 'employee' is co-extensive"); Escobar v. GCI Media, Inc., No. 08-21956, 2009 WL 1758712, at *3 (S.D. Fla. June 22, 2009)(finding that a partner in a web design business was not an "employee" under the FLSA); Godoy v. Restaurant Opportunity Center of New York, Inc., 615 F. Supp. 2d 186, 191 (S.D.N.Y. 2009)(adopting the Wheeler reasoning for partnerships in holding that workers laboring for and together with a not-for-profit corporation toward the co-ownership of a business were not "employees" under the FLSA).

However, in the instant matter, the corporate entity at issue is not a partnership, but a close corporation. (Compl. at ¶ 5.)  Plaintiff thought he was a minority shareholder, but Mr. Anderson terminated him.  The fact that Mr. Anderson was able to fire Plaintiff despite his supposed 49% equity is evidence of

his right to control, indicating an employer-employee relationship. Additionally, "[t]the interest owned by a minority shareholder in a closely held corporation is often a precarious one," and New Jersey courts have characterized the relationship as being one of "acute vulnerability." <u>Walensky v. Jonathan Royce Intern., Inc.</u>, 264 N.J. Super. 276, 280 (App. Div. 1993). As the court in <u>Bostock v. High Tech Elevator Ind.</u>, 260 N.J. Super. 432, 443-44 (App. Div. 1992) explained:

> First, based upon its voting power, "the majority is able to dictate to the minority the manner in which the corporation is run." Second, a minority interest in a closed corporation is difficult to value because the shares are not publicly traded and a fair market is often not available. Dissention within a closed corporation makes the minority interest even more undesirable and unattractive. As a consequence, a shareholder challenging the majority in a closed corporation finds himself on the horns of a dilemma; he can neither profitably leave nor safely stay with the corporation. "In reality, the only prospective buyer turns out to be the majority shareholder." Thus, the limited market for the sale of a minority interest makes the minority particularly vulnerable to manipulation and oppression. A third factor is that a closed corporation frequently originates in the context of personal relationships. Often such business entities are formed by family members or friends. Once the personal relationship between shareholders is destroyed, the viability of the business entity generally deteriorates.

Most importantly, "[t]he controlling shareholders' voting power enables them to freeze-out minority shareholders by terminating their employment, excluding them from participation in management decision-making, and reducing their salary and other income." <u>Mullenberg v. Bikon Corp.</u>, 143 N.J. 168, 176

(1996).  While large portions of Plaintiff's Complaint speak to
why he should obtain reasonable value for his 49% equity, he
also pleads facts indicating how much control Mr. Anderson had
over him, from setting his stipend and compensation amounts to
eventually terminating him from the company.  As a result, the
corporate structure in this case is sufficiently different from
the partnership cases where courts held that the respective
plaintiffs were not employees under the FLSA.

Furthermore, <u>Hess v. Madera Honda Suzuki</u>, No. 10-1821, 2012
WL 4052002, at *5 (E.D. Cal. Sept. 14, 2012) provides support
that Plaintiff should be considered an "employee" under the FLSA,
and stands for the proposition that the two roles of co-owner
and employee are not mutually exclusive. There, Plaintiff, who
was hired as an office manager by Defendants, who were close
corporations, brought an FLSA claim alleging that Defendants
unlawfully withheld Plaintiff's wages and subsequently
terminated her. <u>Id.</u> at *2.  Defendants claimed that Plaintiff was
not an "employee" under the FLSA because she eventually became a
co-owner of one of the Defendants, controlling 24 percent of the
100,000 shares of common stock. <u>Id.</u> at *4.  While the court
conceded that Plaintiff's "substantial ownership interest in the
company and partial control of the company's finances," along
with her "substantial involvement in managing and paying
workers" were "not characteristic of an employee," it

nevertheless found Plaintiff to be an "employee" under the FLSA
because Defendants "provided no authority—and the Court's
research revealed no authority—stating categorically that a co-
owner and shareholder of a closely held corporation who works
for the corporation in another capacity, as was apparently the
case here, cannot also be the corporation's employee for the
purpose of the FLSA.  Indeed, case law seems to suggest
otherwise."); see also Goldberg v. Whitaker House Co-op.,
Inc., 366 U.S. 28, 32 (1961) ("There is nothing inherently
inconsistent between the coexistence of a proprietary and an
employment relationship. If members of a trade union bought
stock in their corporate employer, they would not cease to be
employees within the conception of [the FLSA].  For the
corporation would 'suffer or permit' them to work whether or not
they owned one share of stock or none or many").  The Hess Court
distinguished Steelman and Wheeler because the businesses there
were both partnerships, as opposed to closely held corporations,
and the structures differ in terms of how one own assets, how
profits are shared, and the length of the relationship. Hess,
2012 WL 4052002, at *8.  The court concluded that "insofar as
Plaintiff's employment as officer manager was concerned,
Defendants had control over the conditions of Plaintiff's
employment and determined her rate of payment, and that the

economic reality of the situation was Defendants were Plaintiff's employer and she their employee. <u>Id.</u> at *9.

The facts of the instant matter closely track the facts of <u>Hess</u>. Plaintiff states that he started out at the company making an hourly wage (Compl. at ¶ 10), then changed his compensation structure so that he could be a minority shareholder (Compl. at ¶ 12), and then he was subsequently terminated by the majority shareholder, Mr. Anderson, when buyout negotiations deteriorated. Given the nature of Plaintiff's relationship as a minority shareholder in a close corporation, he has sufficiently demonstrated at this stage in the litigation that he is an "employee" under the FLSA. Plaintiff's management duties and sweat equity do not preclude him from being considered an "employee" for FLSA purposes. <u>See</u> <u>Aguirre v. Safe Hurricane Shutters, Inc.</u>, No. 07-22913, 2011 WL 5986817, at *1 (S.D. Fla. Oct. 29, 2011)("{I]t appears from this [FLSA] language that if an owner or manager performs work, that person fits within the definition of an employee."). Plaintiff has pled sufficient facts at this stage indicating that he was "dependent upon the business to which [he] render[ed] service." <u>Donovan</u>, 757 F.2d at 1382.

## 2. Engaged in Commerce

Plaintiff must also establish that he was "covered" by the FLSA's minimum wage provision. The FLSA extends coverage to

employees by two means: (1) the employee himself may be engaged in commerce or in the production of goods for commerce (so-called "individual" coverage), see 29 U.S.C. § 207(a)(1)(1); or (2) the employee may be employed in an enterprise engaged in commerce or the production of goods for commerce (so-called "enterprise coverage."), see 29 U.S.C. § 203(s)(1). See Genarie v. PRD Mgmt., Inc., No. 04-2082, 2006 WL 436733, at *5 (D.N.J. Feb. 17, 2006). Commerce is defined as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b). Courts in this Circuit frequently hold that alleging that the defendant was an enterprise engaged in commerce under the FLSA "[i]s sufficient for purposes of a motion to dismiss." Dong v. Ren's Garden, No. 09-5642, 2010 WL 1133482, at *4 (D.N.J. Mar. 22, 2010) (internal citations omitted); see also Razak v. Uber Technologies, Inc., No. 16-573, 2016 WL 5874822, at *5 (E.D. Pa. Oct. 7, 2016).

Here, Plaintiff alleges that he was "a W-2 employee of an enterprise engaged in commerce, Connected Entertainment." (Compl. at ¶¶ 35, 128.) Connected Entertainment is "a pop-up photo booth company that allows customers to rent photo booths to take pictures during various events, including, but not limited to, weddings, banquets, family gatherings, professional networking events, and parties of all kinds." (Compl. at ¶ 4.)

This is sufficient to meet the second prong of an FLSA minimum wage claim.

### 3. Minimum Wage Claim

Finally, the Court turns to whether Count XI of Plaintiff's Complaint adequately alleges that Defendants failed to pay Plaintiff the minimum wage of $7.25 per hour, as required by the FLSA. <u>See</u> 29 U.S.C. § 206(a)(1)(C). A plaintiff's average hourly wage is determined "by dividing his total remuneration for employment . . . in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." 29 CFR § 778.109; <u>see</u> 29 C.F.R. § 776.4(a) ("The workweek is to be taken as the standard in determining the applicability of the Act.") Unlike claims brought pursuant to the overtime provision of the FLSA, the Third Circuit has not specifically addressed the level of specificity required to plead a minimum wage claim under the FLSA.

Plaintiff alleges that he was "paid $12,415.00 for 7,040 hours of work performed, both on and off the clock, for Connected Entertainment, a rate equivalent to $1.76 an hour." (Compl. at § 128.)[3] Plaintiff further explains that he worked at Connected Entertainment for a total of forty months, working an

---

[3] Specifically, Plaintiff "worked an average of 40 hours per week for a period of 176 weeks." (Ex. C. to Compl. at 2.)

average of 35-40 hours per week. (Id. at § 47.) As a result, he argues, this is a "clear violation" of the FLSA. (Id. at § 128.) The Court finds these allegations present a plausible claim, as nothing more is required of a Plaintiff at this stage, especially the FLSA requires employers to keep records of the "wages, hours, and other conditions and practice" of its employees. 28 U.S.C. § 211(c). Indeed, regulations advanced pursuant to Section 211(c) of the FLSA require employers to keep, inter alia, payroll records of the following: (1) hours worked per day; (2) total hours worked per work; (3) total daily or weekly straight-time earnings, and (4) total premium pay for overtime hours. See 29 C.F.R. 516.2; see also Williams v. Tri-County Growers, Inc., 747 F.2d 121, 127 (3d Cir. 1984). In light of this burden, "it cannot be the case that a plaintiff must plead specific instances of unpaid overtime or minimum wage violations before being allowed to proceed to discovery to access the employer's records." Harris v. Scriptfleet, No. 11-4561, 2011 WL 6072020, at *3 (D.N.J. Dec. 6, 2011). As a result, Plaintiff's pleading provides adequate factual grounds to support his FLSA claim. Therefore, Defendants' motion to dismiss under Rule 12(b)(6) with respect to the FLSA claim is denied.

## C. State Law Claims - Supplemental Jurisdiction

As stated above, Plaintiff asserts sixteen state-law counts regarding to his employment dispute with Defendants. Where there is original jurisdiction, "the district courts shall [also] have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). However, a district court may decline to exercise supplemental jurisdiction over such claims when:

> (1) The claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

The dispositive provision here appears to focus on (c)(2), regarding predomination. Where "the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." Gibbs, 383 U.S. at 726; see also Borough of W. Mifflin v. Lancaster, 45 F.3d 780, 789 (3d Cir. 1995)(explaining that there are three ways in which a state law

claim may predominate for purposes of subsection 1367(c)(2): (1)
quantity of evidence; (2) comprehensiveness of remedy; and (3)
scope of issues raised).  Generally, a district court will find
substantial predomination "where 'a state claim constitutes the
real body of a case, to which the federal claim is only an
appendage'–only where permitting litigation of all claims in the
district court can accurately be described as allowing a federal
tail to wag what is in substance a state dog." <u>De Asencio v.
Tyson Foods, Inc.</u>, 342 F.3d 301, 309 (3d Cir. 2003)(citations
omitted).

　　　Here, the second criterion is plainly met because the state
law claims substantially predominate over the FLSA minimum wage
claim.  The core of this dispute concerns the corporate control
and breach of contract issues that are presented in the state
law claims that are advanced in Plaintiff's Complaint. <u>See</u> <u>Lyon
v. Whisman</u>, 45 F.3d 758, 763 (3d Cir. 1995)("[I]t is clear that
there is so little overlap between the evidence relevant to the
FLSA and state claims, that there is no 'common nucleus of
operative fact' justifying supplemental jurisdiction over the
state law claims"), <u>Id.</u> at 764 ("When a court exercises federal
jurisdiction pursuant to a rather narrow and specialized federal
statute [like the FLSA,] it should be circumspect when
determining the scope of its supplemental jurisdiction."); 
<u>Krause v. Cherry Hill Fire Dist. 13</u>, 969 F. Supp. 270, 282-83

(D.N.J. 1997)(plaintiff's multifaceted state law claims, which involve additional critical facts, clearly predominate over relatively narrow FLSA minimum wage claim); Hyman v. WM Financial Servs., Inc., No. 06-3038, 2007 WL 1657392, at *5 (D.N.J. June 7, 2007)("[R]esolving these [state law] claims would require the Court to engage in a journey of law and fact afield from the issue raised in their FLSA action.")  The resolution of Plaintiff's state law claims will determine, inter alia, whether Plaintiff has equity ownership in Defendant's company and under what terms and conditions.  In this context, Plaintiff's federal minimum wage issue is plainly an ancillary one.  It does not concern any unique issues of labor and employment law.  Therefore, the various state law claims, not the federal minimum wage claim, drive this litigation.  In the exercise of discretion, the Court declines to exercise supplemental jurisdiction, in accordance with 28 U.S.C. § 1367(c)(2).

The Court notes that Plaintiff still has recourse in state court, and he may well have an ownership interest in Connected Entertainment, or an action for fraud, breach of contract, promissory estoppel, or quantum meruit or unjust enrichment, as he pleads.  Importantly, Plaintiff also can address his minimum wage claims under New Jersey's minimum wage laws. See N.J.S.A. § 34:11-4.1 et seq; N.J.S.A. § 34:11-56.a et seq.  Since January

1, 2014, New Jersey has set a minimum wage that is substantially
higher than the federal level of $7.25 per hour. <u>See</u> N.J.S.A.
Const. Art. 1, ¶ 23 (setting the minimum wage to $8.25 per hour
and calling for annual increases based on changes to the federal
consumer price index).[4]  In the context of the present case, it
would not appear to make sense to litigate the lone FLSA claim
when more robust relief may be available under New Jersey's
minimum wage laws.  As a result, the Court will stay litigation
on the FLSA claim pending the resolution of any state court
action that Plaintiff subsequently files, since the state law
claims clearly predominate in substance and weight over the lone
federal claim.

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part and
deny in part Defendants' motion to dismiss Plaintiff's
Complaint.  The motion to dismiss Plaintiff's FLSA claim in
Count XI is denied, while the motion to dismiss Plaintiff's
remaining state law claims for lack of supplemental jurisdiction
will be granted without prejudice to Plaintiff's right to file
same in the Superior Court of New Jersey.  Because those claims
clearly predominate over the sole federal claim under the FLSA,

---

[4] While the New Jersey minimum wage was $7.25 per hour in 2013,
it increased to $8.25 per hour in 2014, and then to $8.38 per
hour in 2015 and 2016. <u>See</u> N.J.S.A. Const. Art. 1, ¶ 23.

the Court will temporarily stay and administratively terminate the litigation of the FLSA claim, as to which either party may seek to reopen the docket for the proceedings consistent with law.


**April 17, 2017**          **s/ Jerome B. Simandle**
Date                         JEROME B. SIMANDLE
                             Chief U.S. District Judge